1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **EASTERN DISTRICT OF CALIFORNIA**
10

11  DANA SMITHEE, et al.,                )  Case No.: 1:19-cv-00004-NONE-JLT
                                         )
12              Plaintiffs,              )  FINDINGS AND RECOMMENDATIONS
                                         )  GRANTING DEFENDANTS' MOTIONS TO
13       v.                              )  DISMISS
                                         )
14  CALIFORNIA CORRECTIONAL              )
    INSTITUTION, et al.,                 )  (Docs. 66, 67)
15              Defendants.              )
                                         )
16  _____     )

17          After Cyrus Ayers killed himself while in custody, his child, E.M. and his mother, Dana

18  Smithee, filed this lawsuit. They allege Ayers was not provided proper medical care during his

19  incarceration at the California Correctional Institution in Tehachapi and this resulted in his death. In

20  their fourth amended complaint, Plaintiffs claim that Defendant Litt-Stoner, Chief Executive Officer

21  for Health Care Services at CCI, Defendant Narayan, Chief Psychiatrist at CCI, and Defendants

22  Seymour and Celosse, psychologists at CCI, are liable for Ayers' death.

23          Defendants Litt-Stoner, Seymour, Nesson and Celosse previously moved the Court to dismiss

24  the action. Because the second amended complaint failed to state a federal cause of action, the Court

25  dismissed it with leave to amend. (Doc. 47.) On August 29, 2019, Plaintiffs filed a third amended

26  complaint, which only included the following defendants: Narayan, Seymour and Celosse. (Doc. 45.)

27  On September 20, 2019, Defendants Narayan, Seymour and Celosse moved the Court to dismiss the

28  action. (Docs. 48, 49.) Because the third amended complaint still failed to state a federal cause of

action, the Court dismissed it with leave to amend. (Doc. 59.) On January 16, 2020, Plaintiffs filed a fourth amended complaint, including Defendants Litt-Stoner, Narayan, Seymour, and Celosse. (Doc. 65.)

On January 30, 2020, Defendants Litt-Stoner, Narayan, Seymour, and Celosse moved the Court to dismiss the action. (Docs. 66, 67.) Because the fourth amended complaint still fails to state a federal cause of action, the Court recommends it be **DISMISSED** and the Court decline to exercise supplemental jurisdiction.

**I.      Factual Allegations**

On or about February 2, 2018, Ayers died by hanging while in custody at CCI. (Doc. 65 at 4-5; 13.) According to Plaintiffs, Ayers was incarcerated within the California Corrections system around May 2015. (Doc. 65 at 5.)

Plaintiffs report that since 1999, the federal district court has had a special master overseeing the inadequate mental health services, and the suicide prevention efforts of the California Department of Corrections and Rehabilitation. (Doc. 65 at 5-6.) Plaintiffs contend that the special master, referred to as the <u>Coleman</u> court, noted a pattern of inadequacies in suicide prevention at CDCR. (Doc. 65 at 6.) Plaintiffs report that on January 14, 2014, an auditor and expert appointed by the <u>Coleman</u> court, Lindsay M. Hayes, M.S., issued the results of an audit of all 34 Corrections prisons from November 12, 2013 to July 24, 2014, which identified certain ongoing deficiencies. (Doc. 65 at 6-7.) According to Plaintiffs, on April 17, 2017, the California State Auditor issued a report (2016-131) on and to Corrections identifying the deficiencies previously identified that continued to exist in its facilities. (Doc. 65 at 8-9.) Plaintiffs report that from May 23, 2017 to February 15, 2018, Hayes conducted another audit of 23 prisons including CCI at the direction of the <u>Coleman</u> court and found that even though inmates were being referred for reported suicidal ideation and self-injurious behavior, completion of suicide risk evaluations and suicide risk and self-harm evaluations were still not being performed. (Doc. 65 at 13.) Plaintiffs assert that Hayes also found that safety planning for those with suicide risk, and the coordination between it and the suicidal and self-risk evaluations was nearly non-existent. (Doc. 65 at 13.) Plaintiffs also state that Hayes found that compliance rates for annual suicide prevention block training of both medical and mental health staff remained very problematic, and

those trainings that were provided and attended were truncated, presented inadequately and too quickly, post-test reviews were not performed, and workshop workbooks were rarely distributed. (Doc. 65 at 13.)

The Plaintiffs claim that during the entirety of his incarceration at multiple prisons within the State of California, Ayers was receiving mental health care. (Doc. 65 at 7.) They allege that around July 2016, Ayers expressed suicidal ideations while an inmate at Kern Valley State Prison. (Doc. 65 at 7.) Plaintiffs contend that, at this point, Ayers should have been placed under direct observation until a clinician trained to perform a suicide risk assessment conducts a face-to-face evaluation, and a formal risk assessment should have been completed, a plan developed and follow-up care identified. (Doc. 65 at 7.) Plaintiffs also contend that this suicidal history, evaluation and plan should have been tracked on the Corrections-wide Mental Health Tracking System (MHTS) and Mental Health Identifier System (MHIS), and this information on both systems should have been updated daily. (Doc. 65 at 7.) Additionally, Plaintiffs allege that this information should also have been used to produce an Inmate Profile for Ayers that documented his suicide risk, assessment and plan, and accompanied him when he transferred to provide the receiving institution with suicide risk data. (Doc. 65 at 8.) Particularly, Plaintiffs contend that a Suicide Risk Assessment Checklist (SRAC) should have been conducted, as well as a 5-day clinical follow-up treatment plan, and included in the MHTS and MHIS. (Doc. 65 at 8.)

According to Plaintiffs, in or about July 2017, while an inmate at Kern Valley State Prison, Ayers overdosed on prescription medications, which required him to be hospitalized. (Doc. 65 at 9.) Plaintiffs contend that this overdose should have been tracked on the Corrections-wide MHTS and MHIS, his status should have been updated daily and it should have been included with his Inmate Profile. (Doc. 65 at 9.) According to Plaintiffs, throughout 2017, Ayers reported having made multiple suicide attempts, and this should have been tracked on the Corrections-wide MHTS and MHIS, his status should have been updated daily and it should have been included with his Inmate profile. (Doc. 65 at 9.) Plaintiffs also contend that a Suicide Risk Assessment Checklist (SRAC) should have been conducted, as well as a 5-day clinical follow-up treatment plan, and included in the MHTS and MHIS after the overdose and after each report of multiple suicide attempts. (Doc. 65 at 9.)

According to Plaintiffs, around November 2017, Ayers was transferred from Kern Valley State Prison to CCI. (Doc. 65 at 9.) Plaintiffs report that Ayers' Inmate Profile, which should have included detailed records of his suicidal ideation, overdose and reports of suicide attempts should have also been transferred, as well as a treatment and follow-up plan.[1] (Doc. 65 at 10.)

Plaintiffs claim that in November 2017, upon being transferred to CCI, Celosse conducted a suicide risk and self-harm evaluation, in which she noted that Ayers reported he wished to be dead, had an intensity ideation score of "10," and "had collected pills in preparation for suicide."[2] (Doc. 65 at 10.) They allege that Celosse reviewed Ayers' previous medical records and noted that Ayers' condition had significantly worsened over the previous few months and Ayers had a history of self-harm and suicide. (Doc. 65 at 10.) Plaintiffs contend that, at that point, Ayers should have been placed under direct observation, had a formal suicide risk assessment, including the SRAC, which should have been followed by a treatment plan and wellness check within 5 days, and all of this should have been documented on the automated systems. (Doc. 65 at 10.) However, according to Plaintiffs, Ayers was not placed under direct observation, no formal SRAC was performed, no treatment plan was prepared, no wellness check was conducted, and none of it was documented in the MHTS and MHIS. (Doc. 65 at 10.)

According to Plaintiffs, in or about December 2017, Ayers told Narayan that since transferring to CCI, he was not doing well, and Ayers told Narayan that he wished he had a higher level of care, including group therapy and one-on-one sessions with a clinician. (Doc. 65 at 11.) Plaintiffs contend that Narayan should have reviewed Ayers' Inmate Profile, which would have revealed Ayers' suicide risk. (Doc. 65 at 11.) Plaintiffs allege that given Ayers' history of suicidality, Narayan should have conducted a suicide risk assessment using the SRAC and documented this on the MHTS and MHIS. (Doc. 65 at 11.)

Plaintiffs report that in December 2017, Celosse noted that Ayers had "unremitting symptoms of a serious mental disorder" and had initiated self-injurious behavior. (Doc. 65 at 11.) Plaintiffs argue

---

[1] The allegations do not demonstrate that such an Inmate Profile was ever actually created but also allege that it should have been transferred to CCI.

[2] The allegations do not clarify whether Ayers' statement referred to the July 2017 event or whether he was asserting that he *currently* was stockpiling medications.

that Celosse should have reviewed Ayers' Inmate Profile, which would have revealed Ayers' suicide risk. (Doc. 65 at 11.) Plaintiffs argue that given Ayers' history of suicidality, Celosse should have placed Ayers under direct observation, performed a formal risk assessment using SRAC, developed a treatment plan, arranged for a timely wellness check and documented this on the MHTS and MHIS. (Doc. 65 at 11.)

Plaintiffs report that during a period of approximately six weeks before his death, on more than four occasions, Ayers asked Seymour that he be permitted to see his other clinician regarding his mental health. (Doc. 65 at 12.) Plaintiffs contend that Seymour should have reviewed Ayers' Inmate Profile, which would have revealed Ayers' suicide risk. (Doc. 65 at 12.) Plaintiffs argue that given Ayers' history of suicidality, Seymour should have performed a formal risk assessment using SRAC and documented this on the MHTS and MHIS. (Doc. 65 at 12.)

According to Plaintiffs, on or about January 8, 2018, CCI staff noted Ayers' history of "cheeking" medications in an attempt to overdose, and such information would have been included in his Inmate Profile and on the MHTS and MHIS. (Doc. 65 at 12.) Plaintiffs argue that Narayan, Celosse and Seymour should have reviewed Ayers' Inmate Profile and the MHTS and MHIS, which would have revealed Ayers' suicide risk. (Doc. 65 at 12.) Plaintiffs contend that given Ayers' history of suicidality, Narayan, Celosse and Seymour should have performed a formal risk assessment using SRAC and documented this on the MHTS and MHIS. (Doc. 65 at 12.)

Plaintiffs contend that throughout her tenure, and at all times pertinent, Litt-Stoner, as Chief Executive Officer, had the duty to ensure implementation of a robust, constitutionally sufficient suicide prevention program at CCI. (Doc. 65 at 14.) According to Plaintiffs, CDCR adopted a formal policy, as ordered by the Coleman court, that provided for a comprehensive and constitutionally-adequate suicide prevention policy. (Doc. 65 at 14.) However, Plaintiffs argue, Litt-Stoner allowed an informal policy of lax suicide prevention to languish during the entire time Ayers was incarcerated, while she failed to ensure the court-ordered policy was followed by CDCR personnel. (Doc. 65 at 14.)

## II.    Legal Standard

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under Rule 12(b)(6) is appropriate when "the

complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). On a motion filed pursuant to Rule 12(b)(6), "review is limited to the complaint alone." Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993).

Allegations of a complaint must be accepted as true when the Court considers a motion to dismiss for failure to state a claim. Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976). The Supreme Court explained, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Supreme Court explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'

Iqbal, 556 U.S. at 678 (internal citations, quotation marks omitted).

A court must construe the pleading in the light most favorable to the plaintiff and resolve all doubts in favor of the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 421 (1969). "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). However, the Court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." Student Loan Marketing Assoc. v. Hanes, 181 F.R.D. 629, 634 (S.D. Cal. 1998). Leave to amend should not be granted if "it is clear that the complaint could not be saved by any amendment." Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005).

## III.    Discussion and Analysis

### A.    Deliberate Indifference

Defendants allege that Plaintiffs failed to plead sufficient facts to state a federal cause of action

for deliberate indifference. (Doc. 66-1 at 5-10; Doc. 67-1 at 13-19.)

### 1.    *Serious medical need*

A serious medical need exists "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Indications of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

The Ninth Circuit has held heightened suicide risk to be a serious medical need. Simmons v. Navajo County, 609 F.3d 1011, 1018 (9th Cir. 2010). Although Plaintiffs have not established that Ayers' was an imminent suicide risk, because the Defendants do not challenge whether Ayers suffered a serious medical need, the Court accepts that he did so for purposes of these motions.

### 2.    *Deliberate indifference*

If a plaintiff establishes the existence of a serious medical need, he must then show that officials responded to that need with deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In clarifying the culpability required for "deliberate indifference," the Supreme Court held:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.

Farmer, 511 U.S. at 837. Therefore, a defendant must be "subjectively aware that serious harm is likely to result from a failure to provide medical care." Gibson v. County of Washoe, 290 F.3d 1175, 1193 (9th Cir. 2002) (emphasis omitted). When a defendant should have been aware of the risk of substantial harm but, indeed, was not, "then the person has not violated the Eighth Amendment, no matter how severe the risk." Id. at 1188.

Where deliberate indifference relates to medical care, "[t]he requirement of deliberate

indifference is less stringent . . . than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns." Holliday v. Naku, 2009 U.S. Dist. LEXIS 55757, at *12 (E.D. Cal. June 26, 2009) (citing McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1991)). Generally, deliberate indifference to serious medical needs may be manifested in two ways: "when prison officials deny, delay, or intentionally interfere with medical treatment, or . . . by the way in which prison physicians provide medical care." Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988). A claimant seeking to establish deliberate indifference must show "both (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Conn v. City of Reno, 591 F.3d 1081 (9th Cir. 2010) (emphasis added).

Deliberate indifference is a high legal standard. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

### a.    Defendant Pratap Narayan

Narayan argues that the fourth amended complaint did not correct or cure the deficiencies in their Eighth Amendment claim. (Doc. 66-1 at 7.) Narayan contends that Plaintiffs "added general references to various special masters' reports about inmate medical care, various audit reports, and mental health program guidelines." (Doc. 66-1 at 7.) As Defendant correctly points out, "Plaintiffs' generalized references to various special masters' reports, audit reports, and mental health program guidelines were mostly to time periods predating Ayers' CDCR incarceration, periods before his incarceration at CCI or relate to other CDCR institutions." (Doc. 76 at 2; see also Doc. 66-1 at 7-8.)

Specifically, the fourth amended complaint alleges that Ayers' "suicidal history, evaluation and plan should have been tracked on the Corrections-wide Mental Health Tracking System (MHTS) and Mental Health Identifier System (MHIS)," that this information on both systems should have been

updated daily, and should also have been used to produce an "Inmate Profile for AYERS that documented his suicide risk, assessment and plan, and accompanied him when he transferred." (Doc. 65 at 7-8.) Related to Narayan, Plaintiffs claim that Narayan "should have reviewed Mr. AYERS' Inmate Profile, which would have revealed Mr. AYERS' suicide risk," and that Narayan "should have conducted, but did not, a suicide risk assessment using the SRAC and document this on the MHTS and MHIS." (Doc. 65 at 11.) However, as Plaintiffs allege, the information from the MHTS and MHIS was *supposed to be used* to produce the "Inmate Profile;" Narayan cannot have failed to review such an "Inmate Profile" that was never produced and did not exist. Even if the records Plaintiffs allege Narayan should have reviewed existed, it is pure speculation that such records would reveal sufficient information to provide knowledge to Narayan that there was an imminent substantial risk of serious harm to Ayers' health and then disregarded it. As Defendant argues in his reply, the allegations against Narayan "consist of arguments, speculation, conjecture or conclusory statements about what he *should* have known, *should* have been aware [of], *should* have done or *should* have been in a position to do." (Doc. 76 at 2-3, emphasis in original.) Similarly, if Plaintiffs are alleging that doctors, prior to Defendants, were not using the Corrections-wide Mental Health Tracking System and Mental Health Identifier System, Defendants cannot be held liable for deficiencies of other medical providers and institutions (*i.e.*, prior to Ayers' incarceration at CCI). Moreover, Defendant argues that there was also no allegation that Narayan was responsible for any historical system-wide deficiency in inmate mental health care or suicide prevention referenced throughout the fourth amended complaint. (Doc. 66-1 at 8; Doc. 76 at 2.)

Defendant contends that "Plaintiffs do not claim a failure to respond or a failure to provide medical care; but rather allege a disagreement or differing opinion about the medical care that was admittedly provided." (Doc. 66-1 at 8.) As Defendant points out, the Plaintiffs state in their fourth amended complaint that during the entirety of his incarceration at multiple prisons within the State of California, Ayers was receiving mental health care. (Doc. 65 at 7; Doc. 66-1 at 8.) The Court addressed this point in its last Findings and Recommendations. (Doc. 54 at 6-7.) Specifically, Plaintiffs continue to claim in the fourth amended complaint, as previously alleged, that Ayers told Narayan that since transferring to CCI, Ayers was not doing well, and he told Narayan "that he wished

he had a higher level of care, including group therapy and one-on-one sessions with a clinician." (Doc. 65 at 11; Doc. 45 at 5.) As Narayan points out, it remains the same in the fourth amended complaint that there are no factual allegations that Narayan knew that Ayers' self-report and his history required him to take a different approach and to place Ayers on a suicide watch or to provide different or additional medical care. (Doc. 54 at 6; Doc. 66-1 at 9.) A defendant must be "subjectively aware that serious harm is likely to result from a failure to provide medical care." Gibson, 290 F.3d at 1193. The Court accepts that Narayan did not provide Ayers with the higher level of care Ayers' requested and did not place him on suicide watch. However, the allegations admit that Narayan did not fail to provide medical care, only that he did not provide the medical care that Ayers' wanted. (See Doc. 65 at 7; Doc. 54 at 7; Doc. 66-1 at 9.) Mere differences of opinion as to the proper course of treatment for a medical condition do not give rise to a medical indifference claim. Additionally, no facts were alleged whether group therapy was available at the prison for an inmate with Ayers' custody and security level or if it was medically appropriate for Ayers. Plaintiffs fail to plead facts showing Narayan was subjectively aware and actually drew the inference that there was an *imminent* substantial risk of serious harm to Ayers' health. When a defendant should have been aware of the risk of substantial harm but, indeed, was not, "then the person has not violated the Eighth Amendment, no matter how severe the risk." See id. at 1188.

Of most significance, Plaintiffs have failed to plead facts showing a causal connection between Narayan's conduct and Ayers' subsequent suicide, even with considering the newly alleged facts. As Defendant argues, "Plaintiffs made no specific factual allegations that tie or link the various references to special masters' reports or audit reports to any specific Narayan action that had anything to do with Ayers' February 2018 suicide." (Doc. 66-1 at 8; see also Doc. 76 at 2.) Defendant alleges in his reply that Narayan was not the Chief Psychiatrist at CCI, that Narayan was not based or stationed at CCI, and had a single communication with Ayers, via a video conference. (Doc. 76 at 2.) Plaintiffs continue to allege in their fourth amended complaint that Narayan saw Ayers on just one occasion in December 2017 and have not alleged facts about any information brought to Narayan's attention about Ayers' condition or any medical treatment after this visit and before Ayers' death in February 2018. (See Doc. 65.) Accordingly, as Narayan argues, "[t]here are no other particular or specific factual allegations

about any other Narayan communication, interaction or dealing with Ayers or any other Narayan involvement in, or knowledge about, Ayer[s'] medical care or custody arrangements between December 7, 2017 and Ayer[s'] February 2, 2018 suicide." (Doc. 76 at 2.) Thus, Plaintiffs fail to demonstrate that Narayan was aware that a substantial risk of harm existed. Accordingly, Plaintiffs fail to state a cognizable claim for violation of the Eighth Amendment against Narayan.

### b. Defendant Celosse

As Defendant points out, the allegations in the fourth amended complaint with respect to Celosse are the same allegations that Plaintiffs made in the third amended complaint. (Doc. 67-1 at 15.) Defendant contends that Plaintiffs have changed their allegations slightly, to add more detail as to what they believe Celosse should have done. (Doc. 67-1 at 15.) Specifically, Plaintiffs continue to allege that in November 2017, upon Ayers being transferred to CCI, Celosse conducted a suicide risk and self-harm evaluation on Ayers, in which she reported he wished to be dead, had an intensity of ideation score of "10", and had collected pills in preparation of suicide. (Doc. 65 at 10; Doc. 45 at 5.) Plaintiffs also allege again that Celosse reviewed Ayers' previous medical records and noted that Ayers' condition had significantly worsened over the previous few months and Ayers had a history of self-harm and suicide. (Doc. 65 at 10; Doc. 45 at 5.) Plaintiffs further contend that in December 2017, Celosse noted that Ayers had "unremitting symptoms of a serious mental disorder" and had initiated self-injurious behavior. (Doc. 65 at 11; Doc. 45 at 6.)

Significantly, "[m]ere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06; see also Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004). Accordingly, the Ninth Circuit has determined a prisoner must allege "the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" See Toguchi, 391 F.3d at 1058 (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

Plaintiffs fail to allege facts sufficient to support a conclusion that the treatment Ayers received was "medically unacceptable" and that Celosse disregarded a substantial risk to Ayers' health. See Toguchi, 391 F.3d at 1058. To the contrary, the facts fail to allege that Celosse's decisions were

not medically supported. In making this observation, the Court accepts as true that Celosse was aware of Ayers' symptoms and history of self-harm and suicide when Celosse chose not to recommend Ayers for suicide watch. As Defendant argues, the facts do not demonstrate that Celosse knew Ayers was *acutely* suicidal or that he required an immediate change to his mental health care. (Doc. 77 at 6-7.) Without more, the facts suggest only that the Plaintiffs disagree with Celosse's medical judgment.

Plaintiffs allegations that Celosse did not follow certain protocols similarly fails to show deliberate indifference. (See Doc. 65 at 10-11; Doc. 67-1 at 15; Doc. 77 at 6-7.) For instance, Plaintiffs claim that Celosse should have placed Ayers under direct observation. (Doc. 65 at 11.) However, as Defendant argues, Plaintiffs' more specific allegations regarding what they believe Celosse should have done does not change the deliberate indifference analysis. (Doc. 67-1 at 15.) Such allegations do not demonstrate that Celosse knew of a serious risk to Ayers' health and disregarded it. (Doc. 77 at 7.) Defendant asserts correctly that "[a] deliberate indifference claim requires more than Celosse drawing an incorrect medical conclusion, it requires that she actually know that [Ayers] was acutely suicidal, but was indifferent to that fact." (Doc. 67-1 at 15.) And as Defendant alleges, Plaintiffs make no allegation that Celosse had such knowledge. (Doc. 67-1 at 15.) Plaintiffs allegations may show a mistake in diagnosis but fall short of showing deliberate indifference. (Doc. 67-1 at 15; Doc. 77 at 7.) As Defendant asserts, "[m]ere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." (Doc. 77 at 7.)

Plaintiffs also claim that Celosse should have reviewed Ayers' Inmate Profile, "which would have revealed Mr. AYERS' suicide risk." (Doc. 65 at 11.) However, as discussed previously, Plaintiffs also claim that such an Inmate Profile should have been produced, and it should have accompanied Ayers when he transferred to CCI but neither occurred. (See Doc. 65 at 8.) Plaintiffs assertion that Defendant should have reviewed something that didn't exist doesn't support deliberate indifference. Though it may suggest a systemic failure, there is no showing Defendant had any authority or control over the system. As Defendant argues in reply, the alleged system-wide problems do not show anything about Celosse's conduct toward Ayers, and moreover, do not show that Celosse was deliberately indifferent. (See Doc. 77 at 7.) Alternatively, even if the records Plaintiffs allege Celosse should have reviewed existed, it is pure speculation that such records would reveal sufficient

information to provide knowledge to Celosse that there was an imminent substantial risk of serious harm to Ayers' health and then disregarded it.

Plaintiffs also fail to plead facts demonstrating that Celosse's conduct in November or December caused Ayers' death in February. (See Doc. 77 at 6-7.) Accordingly, Plaintiffs fail to state a cognizable claim for violation of the Eighth Amendment against Celosse.

### c. *Defendant Seymour*

As Defendant argues, the allegations in the fourth amended complaint as to Seymour are the same as those previously pled in the third amended complaint. (Doc. 67-1 at 17.) Again, as Defendant points out, the fourth amended complaint provides more detail about what Plaintiffs believe Seymour should have done. (Doc. 67-1 at 17-18.) However, as Defendant contends, the facts pled in the fourth amended complaint, "even if true, would not show that Seymour knew of, and disregarded, a serious risk to [Ayers'] health." (Doc. 67-1 at 18.)

Specifically, Plaintiffs allege again in their fourth amended complaint that during a period of approximately six weeks before his death, on more than four occasions, Ayers asked Seymour (a psychologist) to be allowed to see his mental health "clinician." (Doc. 65 at 12; Doc. 45 at 6.) They still allege no facts indicating that Ayers reported to Seymour why he wanted this consultation and no facts that Ayers was acutely suicidal at that time. Also, as the Court previously pointed out, Plaintiffs do not explain to whom Ayers was referring when he asked to see his "clinician." (Doc. 54 at 9.) Seymour was a practicing and treating psychologist and was, therefore, a "clinician." Plaintiffs fail to demonstrate how the denial of seeing a different mental health clinician is a Constitutional violation; indeed, many insureds outside of prison do not get to see a provider of their choice.

Additionally, as Defendant argues, Seymour is not alleged to have known of any acute suicide risk. (Doc. 67-1 at 18; Doc. 77 at 7.) Plaintiffs do not explain their contention that Seymour should have acted on Ayers' request differently or how her failure to do so caused Ayers' death. Most notably, Plaintiffs do not plead facts showing that Seymour knew Ayers' requests demonstrated that he was at imminent risk of suicide as opposed to an ideation that was not acute.

Plaintiffs also appear to provide more detail than the third amended complaint about what treatment Plaintiffs believe Seymour should have prescribed, stating that Seymour should have

13

performed a formal risk assessment using SRAC and documented this on MHTS and MHIS. (Doc. 65 at 12; Doc. 67-1 at 17-18; Doc. 77 at 8.) However, as Defendant argues, the facts do not demonstrate that Seymour knew such an analysis was necessary. (Doc. 77 at 8.) Plaintiffs fail to allege facts sufficient to support a conclusion that the treatment Seymour provided was "medically unacceptable" or that Seymour was aware of and disregarded a significant risk of harm to Ayers' health. See Toguchi, 391 F.3d at 1058. Thus, Plaintiffs fail to state a cognizable claim against Seymour for a failure to provide adequate medical care. Accordingly, the Court recommends that the motion to dismiss the claim for deliberate indifference be granted as to Seymour.

### d.     Defendant Litt-Stoner

As an initial matter, Defendant claims that Plaintiffs have abandoned their claims against Litt-Stoner because Plaintiffs alleged claims against Litt-Stoner in the second amended complaint but, after the Court dismissed the second amended complaint with leave to amend, did not raise them in the third amended complaint. (Doc. 67-1 at 21; Doc. 77 at 12-13.) Defendant cites Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946, 973 n.14 (9th Cir 2013), stating that where a party is granted leave to amend, but does not replead a claim, that claim is deemed abandoned. (Doc. 67-1 at 21.) However, as Plaintiffs argue, the claims are abandoned if they were *not* included in a subsequent amended pleading. (Doc. 74 at 26.) The case cited clearly states that, *if not replead*, that claim is deemed abandoned. Chubb Custom Ins. Co., 710 F.3d at 973 n.14 (emphasis added); see also Lacey v. Maricopa County, 693 F.3d 896, 925, 928 (9th Cir. 2012) ("[F]or any claims voluntarily dismissed, we will consider those claims to be waived if not repled."). In this case, the claims against Litt-Stoner were in fact repled in the fourth amended complaint. (See Doc. 65.) In the additional case cited by Defendant in reply, it was the plaintiffs' subsequent failure to include claims against certain defendants in the amended complaint, without still being added back into the case, that deemed the claims against those defendants to be waived or abandoned.(Doc. 77 at 12-13); see Westley v. Oclaro, Inc., 2013 U.S. Dist. LEXIS 76258, *31 (N.D. Cal. May 30, 2013). In this case, Plaintiffs have indeed

added the claims against Litt-Stoner back into the case in their fourth amended complaint (see Doc. 65), and such claims have not been abandoned.[3]

Regarding Plaintiffs' claim of deliberate indifference against Litt-Stoner, Defendant claims that just as the Court previously found Plaintiffs failed to state a claim because "[n]one of these facts are tied to Ayers and, consequently, fail to demonstrate that Litt-Stoner knew of and acted with deliberate indifference to Ayers' medical condition," the same is true of the allegations of the fourth amended complaint. (Doc. 67-1 at 19; Doc. 41 at 7.)

Under Section 1983, Plaintiffs must demonstrate that each defendant personally participated in the deprivation of their rights. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Thus, liability may not be imposed on supervisory personnel under Section 1983 on the theory of *respondeat superior*, as each defendant is only liable for his or her own misconduct. Iqbal, 129 S.Ct. at 1948-49 (2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009). A supervisor may be held liable only if he or she "participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); accord Starr v. Baca, 633 F.3d 1191 (9th Cir. 2011); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009); Preschooler II v. Clark County School Board of Trustees, 479 F.3d 1175, 1182 (9th Cir. 2007); Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997).

The fourth amended complaint alleges facts regarding system-wide audits of CDCR's suicide prevention program, that found that there were problems with the overall implementation, and that CCI was one of the prisons included in the audits. (See Doc. 65.) The fourth amended complaint goes on to allege that CDCR adopted a formal policy to prevent suicides, but that Litt-Stoner "allowed an informal policy of lax suicide prevention to languish" at CCI. (Doc. 65 at 14.) However, as Defendant contends, the fourth amended complaint does not plead facts against Litt-Stoner that reveal failures at CCI or with CCI staff, and it does not plead facts showing that Litt-Stoner had any knowledge of any failures at CCI. (See Doc. 77 at 10.) Notably, the audits and reports referenced by Plaintiffs were mostly to time periods predating Ayers' CDCR incarceration, periods before his incarceration at CCI

---

[3] In any event, Plaintiffs are within their statute of limitations for adding claims and defendants.

or relate to other CDCR institutions. (See Doc. 65.) Plaintiffs' generic allegations regarding the policies Litt-Stoner allowed at CCI are insufficient to show that Litt-Stoner was indifferent to Ayers' medical needs. (Doc. 77 at 10.) The fourth amended complaint does not demonstrate how following formal policies or different policies than those implemented by Litt-Stoner would have led to different care for Ayers or would have prevented his death.

Plaintiffs do not allege that Litt-Stoner knew of a serious risk to Ayers and does not allege that she ignored that risk. (Doc. 67-1 at 19; Doc. 77 at 8-9.) Plaintiffs fail to plead a connection between the alleged conduct and Ayers' suicide, and moreover, fail to plead that Litt-Stoner had any contact with Ayers at all. (See Doc. 77 at 10.) Plaintiffs' allegations fail to demonstrate how any failures on Litt-Stoner's part affected Ayers' care or caused his death. Defendant can only be liable for her own misconduct, and Plaintiffs here have failed to demonstrate that Litt-Stoner personally participated in the deprivation of Ayers' rights. See Iqbal, 129 S.Ct. at 1948-49; Jones, 297 F.3d at 934. None of the alleged facts are tied to Ayers and, consequently, fail to demonstrate that Litt-Stoner knew of and acted with deliberate indifference to Ayers' medical condition. See Gibson, 290 F.3d at 1188 ("When a defendant should have been aware of the risk of substantial harm but, indeed, was not, 'then the person has not violated the Eighth Amendment, no matter how severe the risk.'") Thus, Plaintiffs' claim against Litt-Stoner for deliberate indifference to his serious medical needs in violation of the Eighth Amendment is not cognizable and should be dismissed.

### e. Claims as to all Defendants related to *Coleman*

Plaintiffs appear to make arguments, as to all Defendants, pursuant to the federal district court's special master's reports and rulings in Coleman v. Brown, et al., that the defendants have failed to comply with the orders issued in that case. Indeed, the fourth amended complaint appears to present a historical review and critique of state-wide inmate mental health care. (See generally, Doc. 65; see Doc. 76 at 1-2.) Plaintiffs quote from various special master's reports, audit reports, and recommendations for mental health guidelines. (See generally, Doc. 65; see Doc. 76 at 1-2.) However, as Defendant argues, to the extent Plaintiffs are seeking to litigate CDCR's compliance with the federal district court's special master's reports and rulings in Coleman v. Brown, et al., this "complaint is the wrong legal vehicle against the wrong defendant for a system-wide challenge to inmate mental

health care or suicide prevention procedures." (Doc. 76 at 2.) Defendants in this case are not parties to the ongoing <u>Coleman</u> litigation, and Plaintiffs claims under <u>Coleman</u> are not actionable here but must be raised in that action. <u>Frost v. Symington</u>, 197 F.3d 348, 358-59 (9th Cir. 1999).

**B.     Failure to Train – Defendant Litt-Stoner[4]**

Plaintiffs allege in the fourth amended complaint that Defendant Litt-Stoner failed to adequately train CCI staff in suicide prevention and response training. (Doc. 65 at 20-23.) However, Defendant argues that the allegations of the fourth amended complaint are limited to lists of generalized training failures that allegedly occurred at CCI or systemwide at CDCR. (Doc. 67-1 at 20; Doc. 77 at 12.) Defendant contends those allegations are not closely related to the ultimate injury and do not show deliberate indifference on Litt-Stoner's part. (Doc. 67-1 at 20.) Defendant argues that Plaintiffs' generic recitations of supposed failures to train fail to connect any alleged constitutional violation to conduct undertaken by Litt-Stoner. (Doc. 67-1 at 21; Doc. 77 at 12.)

A supervisor's failure to train subordinates may give rise to individual liability under Section 1983 where the failure amounts to deliberate indifference to the rights of persons with whom the subordinates are likely to come into contact. <u>See</u> <u>Canell v. Lightner</u>, 143 F.3d 1210, 1213-14 (9th Cir. 1998). To impose liability under this theory, a plaintiff must demonstrate the subordinate's training was inadequate, the inadequate training was a deliberate choice on the part of the supervisor, and the inadequate training caused the constitutional violation. <u>Id.</u> at 1214; <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 391 (1989); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 681 (9th Cir. 2001).

Plaintiffs do not allege facts that show Litt-Stoner was aware of any training, policy or staff deficiency for the mental health staff at CCI or, if she was, that Ayers was at risk as a consequence. Plaintiffs allege that mental health personnel at CCI were untrained on the administration of suicide evaluation, that CDCR was noncompliant with suicide prevention training requirements, and CDCR mental health staff had problematic or inadequate suicide prevention training. (Doc. 65 at 20.) Notably, the audits and reports referenced by Plaintiffs were mostly to time periods predating Ayers' CDCR incarceration, periods before his incarceration at CCI or relate to other CDCR institutions. (See

---

[4] Defendant also claims that Plaintiffs have abandoned this claim against Litt-Stoner (<u>see</u> Doc. 67-1 at 21), which argument is addressed above.

Doc. 65.) Nevertheless, Plaintiffs fail to allege facts demonstrating that Litt-Stoner was aware of any of these issues. (See Doc. 77 at 11-12.) Absent this, the Court can draw no inference that Litt-Stoner can be held liable merely because these problems existed at CDCR. As this Court previously observed, "[t]he cases in which supervisors have been held liable under a failure to train/supervise theory involve conscious choices made with full knowledge that a problem existed." Woodward v. Kokor, 2017 U.S. Dist. LEXIS 91777, 2017 WL 2572456 (E.D. Cal. June 13, 2017) (citation omitted); see also Cousin v. Small, 325 F.3d 627, 637 (5th Cir. 2003) (explaining that to impose liability for failure to train, "a plaintiff must usually demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation"). As such, because Plaintiffs fail to demonstrate that Litt-Stoner knew of any violations or deficiencies, Plaintiffs cannot allege that Litt-Stoner failed to act to prevent them. See Taylor, 880 F.2d at 1045.

Nevertheless, even if Litt-Stoner was actually aware of these deficiencies, Plaintiffs fail to allege facts to demonstrate Litt-Stoner was aware that Ayers was at risk as a consequence of any alleged training deficiencies. As stated above, failure to train subordinates gives rise to individual liability under Section 1983 where the failure amounts to deliberate indifference to the rights of persons with whom the subordinates are likely to come into contact. See Canell, 143 F.3d at 1213-14. Plaintiffs have alleged that Litt-Stoner was responsible for implementing and ensuring staff participation in training programs and ensuring mental health personnel were properly trained in suicide prevention. (Doc. 65 at 20-21.) However, Plaintiffs have failed to allege more than just generalized inadequacies of the suicide prevention and response training. As Defendant argues, Plaintiffs' allegations are not closely related to the ultimate injury to Ayers and do not show deliberate indifference on Litt-Stoner's part. (See Doc. 67-1 at 20; Doc. 77 at 12.) Plaintiffs failed to allege that Litt-Stoner had any contact with Ayers or was even aware of him or any risk to him. For example, one alleged training failure includes the failure to provide training related to "[m]ental health evaluations for rules violation reports." (Doc. 65 at 21.) There is no indication that Ayers was ever charged with a rules violation or, if he was, that he suffered a violation report contemporaneous to his death or how the failure to evaluate his mental health at the time, caused his death. If this training failure does not relate to Ayers' death, the Court is at a loss as to why this is listed in the complaint. The allegations

must describe the relevant training that was not provided or was provided inadequately and allege facts to demonstrate how this caused Ayers' death.

Consequently, the Court finds the facts alleged are not sufficient to support Plaintiffs' claim for failure to train against Litt-Stoner and recommends that this claim for relief be dismissed.

**C.    Recoverable Damages – Federal Law Claim**

In <u>Chaudhry v. City of Los Angeles</u>, 751 F.3d 1096, 1103 (9th Cir. May 19, 2014), the Ninth Circuit confronted the question of whether pre-death pain and suffering damages were allowed in § 1983 suits brought in California. The defendants in that case argued that since Cal. Code Civ. Proc. § 377.34 barred a decedent's estate to recover for the decedent's pre-death pain and suffering, these damages should similarly be barred under § 1983. The Ninth Circuit disagreed and, in so doing, reasoned that "[o]ne of Congress's primary goals in enacting § 1983 was to provide a remedy for killings unconstitutionally caused or acquiesced in by state governments." <u>Id.</u> (citing <u>Monroe v. Pape</u>, 365 U.S. 167, 172-76 (1961)). The court concluded that since the "practical effect of § 377.34 is to reduce, and often eliminate, compensatory damage awards for the survivors of people killed by violations of federal law, . . . a prohibition against pre-death pain and suffering awards for a decedent's estate has the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim." <u>Id.</u> at 1103-04. Thus, pre-death pain and suffering awards are allowed for § 1983 cases where the victim died from the unconstitutional conduct of the defendant. <u>Id.</u>

Though the successor can seek damages suffered by the decedent before his death, the complaint here does not attempt to do that. Rather, the complaint seeks damages suffered by E.M. and Ms. Smithee. (Doc. 65 at 17, 19-20, 22-23 ["Plaintiffs DANA SMITHEE and E.M., . . . have suffered general and special damages including but not limited to loss of love, companionship, comfort, care and support . . ."]). Though they allege that the conduct of the defendants caused Ayers' death, they do so only to demonstrate that because the defendants caused Ayers' death, they indirectly caused the plaintiffs' damages is the source of their damages. Accordingly, because the complaint does not seek Mr. Ayers' pre-death pain and suffering, and, indeed, do not allege facts to support that Ayers suffered these damages, these damages sought are not recoverable in this action.

///

**D.    Qualified Immunity**

Due to the dearth of facts alleged to support the conclusions made by Plaintiffs, the Court declines to consider qualified immunity at this time.

**E.    Supplemental Jurisdiction**

The remaining claims in Plaintiffs' fourth amended complaint arise under state law, including negligence and wrongful death. (See generally Doc. 65.) Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." Significantly, the Ninth Circuit determined that "[w]hen federal claims are dismissed before trial . . . pendant state claims also should be dismissed." Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992) (internal quotation marks omitted); see also Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1189 (9th Cir. 2001) (recognizing the propriety of dismissing supplemental state law claims without prejudice when the district court has dismissed the federal claims over which it had original jurisdiction). Because the Court grants the motions to dismiss as to the federal law claims, the Court declines to exercise supplemental jurisdiction over state law claims.

**IV.    Findings and Recommendations**

Plaintiffs fail to state a cognizable claim under federal law. Based upon the foregoing, the Court **RECOMMENDS**:

1.    Defendants' Motions to Dismiss (Docs. 66, 67) be **GRANTED**;

2.    Plaintiffs' Fourth Amended Complaint be **DISMISSED** without leave to amend;

3.    The Court decline to exercise supplemental jurisdiction over the state law claims.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days after being served with these findings and recommendations, Plaintiffs may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiffs are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d

1153 (9th Cir. 1991); <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 834 (9th Cir. 2014).

IT IS SO ORDERED.

    Dated:   __**March 29, 2020**__               ____**/s/ Jennifer L. Thurston**
                                                   UNITED STATES MAGISTRATE JUDGE