UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA SMITHEE, *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>CALIFORNIA CORRECTIONAL<br>INSTITUTION, *et al.*,<br><br>                    Defendants. | Case No. 1:19-cv-00004-JLT-CDB (PC)<br><br>ORDER (1) DENYING PLAINTIFFS' MOTIONS TO EXCLUDE DEFENDANT'S EXPERT WITNESS AND (2) DENYING DEFENDANT'S MOTION TO DISQUALIFY PLAINTIFFS' EXPERT WITNESS<br><br>(Docs. 161, 162, 175)<br><br>ORDER DENYING AS MOOT PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S REPLY BRIEF<br><br>(Doc. 166)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 163)<br><br>**14-DAY OBJECTION PERIOD** |

Cyrus Ayers ("Ayers" or "Decedent") died by suicide on February 2, 2018, while incarcerated at California Correctional Institution.  Plaintiff Dana Smithee, the mother of Decedent, and Plaintiff E.M., a minor, by and through her guardian ad litem Jennifer Montes, filed the initial complaint on December 31, 2018 (Doc. 1), and the operative Sixth Amended Complaint on August 24, 2023.  (Doc.

142).  Plaintiffs raise a claim pursuant to 42 U.S.C. § 1983 for deliberate indifference against Defendant Pratap Narayan, M.D.

Pending before the Court is Defendant's motion for summary judgment, filed on September 16, 2024.  (Doc. 163).  Plaintiffs filed an opposition on September 27, 2024.  (Doc. 164).  Defendant filed a reply to Plaintiffs' opposition on October 8, 2024.  (Doc. 165).  The parties convened for hearing and oral argument on their discovery motions relating to expert witnesses on October 22, 2024, and the Court submitted Defendant's motion for summary judgment without oral argument.  (Doc. 172) (citing Local Rule 160(g)).

**BACKGROUND**

**A.    Defendant's Statement of Undisputed Facts**[1]

Plaintiffs Dana Smithee, the mother of Decedent Cyrus Ayers ("Decedent"), and minor "E.M.," the only child and heir of Decedent, by and through her guardian ad litem, Jennifer Montes (Doc. 9) (collectively, "Plaintiffs"), through the operative Sixth Amendment Complaint,[2] bring an Eighth Amendment deliberate indifference claim under 42. U.S.C. § 1983 against Defendant Pratap Narayan, M.D.  (Doc. 142).  Decedent was an inmate at California Correctional Institute ("CCI") located in Tehachapi, California, from November 9, 2017, until the time of his death by suicide on February 2, 2018.  (Doc. 142 ¶ 43; Doc. 163-4 n. 2; Doc. 164-1 p. 26 n. 3).

At the time of Decedent's death, Defendant Pratap Narayan ("Defendant" or "Narayan") was employed as a psychiatrist in the Division of Telepsychiatry for the California Department of Corrections and Rehabilitation ("CDCR").[3]  (Doc. 142 ¶ 8; Doc. 163-4 n. 3; Doc. 164-1 ns. 3, 4).

---

[1] The following facts are undisputed unless noted otherwise.

[2] On August 18, 2023, the undersigned entered findings & recommendations (the "F&R") denying Defendant's motion to dismiss and directing Plaintiffs to file a sixth amended complaint for the limited purpose of clarifying the damages sought in connection with Decedent's pain and suffering.  (Doc. 141).  Plaintiffs filed the Sixth Amended Complaint on August 24, 2023 (Doc. 142), and the assigned district judge adopted the F&R on September 8, 2023 (Doc. 143).

[3] In his reply brief, Defendant does not dispute Plaintiffs' assertion that, as of the date of Decedent's death on February 2, 2018, Defendant was Chief Psychiatrist for CCI.  (Doc. 164-1 n. 4, citing Salma Khan Declaration ("Khan Declaration") ¶ 4, Ex. A Report of Salma Khan, M.D. ("Ex. A Khan Report") pp. 9–10 ("Chief psychiatrist Narayan was the leader of the treatment team and was responsible for the assessment and treatment of patients, including Ayers.")).

1   Defendant provided services for CCI almost exclusively via telemedicine from his office in Elk Grove,

2   California, and visited CCI two times per year, spending a day on-site.  (Doc. 163-4 ns. 4, 5; Doc. 164-

3   1 ns. 4, 5).

4        Dr. Karin Celosse, a psychologist employed by CCI, was one of a group of mental health

5   employees known as "primary clinicians."[4]  (Doc. 163-4 n. 6; Doc. 164-1 n. 6).  Primary clinicians at

6   CCI are responsible for overseeing all aspects of mental healthcare, excluding medications, such as:

7   providing counseling; assigning people to groups; assisting with the classification of suicide risk

8   assessments; triaging requests for mental health services from inmate patients; and performing

9   consultation referrals when required.[5]  (Doc. 163-4 n. 7; Doc. 164-1 n. 7).  Defendant did not personally

10  oversee or participate in any of Dr. Celosse's assessments of the inmates.[6]  (Doc. 163-4 n. 9; Doc. 164-

11  1 n. 9).

12       Dr. Celosse completed an initial mental health and suicide risk evaluation when Decedent arrived

13  at CCI (November 9, 2017).  (Doc. 163-4 n. 8; Doc. 164-1 n. 8).  Dr. Celosse testified that the mental

14  health and suicide risk evaluations involved taking a history from Decedent, which provided background

15  on Decedent's experiences of how he became incarcerated, his prior substance use, the symptoms that

16  he was currently experiencing, and information about what he was hoping to do and looking forward to.

17  (Doc. 163-4 n. 10; Doc. 164-1 n. 10, citing Ex. D Celosse Depo. 58:13-15).  The suicide risk assessment

18  included a review of Decedent's prior suicide attempts, including two incidents involving Decedent's

19  consumption of pills that, on one occasion, resulted in Decedent's relocation to a "crisis bed."  (Doc.

20  163-4 n. 11; Doc. 164-1 n. 11).  Dr. Celosse testified that between November 2017 and her departure

21

22  _____

23  [4] Plaintiffs note that Dr. Celosse left CCI in December 2017.  (Doc. 164-1 n. 6).

24  [5] Plaintiffs dispute Defendant's description of Dr. Celosse's position and note that Dr. Celosse testified
    that she was "part of what's called a CC[C]MS program."  (Doc. 164-1 n. 6).  "[I]n the CC[C]MS
    program, you are required to see the patients once a month as either a social worker or a
25  psychologist. . . And you are supposed to provide therapy for them."  (Ex. D Deposition of Karin
    Celosse ("Ex. D Celosse Depo.") p. 8:15-25).

26
    [6] Plaintiffs dispute the implication that because Defendant was not personally present, he had no
27  responsibility for being aware of the contents of Dr. Celosse's assessments of inmates, and argue that
    the assessments were well-documented, and Defendant had a responsibility to be apprised of their
28  contents.  (Doc. 164-1 n. 9).

from CCI in December 2017, Decedent was not placed on suicide watch because "[Decedent] did not indicate that he was suicidal." (Doc. 163-4 n. 12; Doc. 164-1 n. 12, citing Ex. D Celosse Depo. 22:13-17). To the contrary, Dr. Celosse testified that absent "an individual [] telling you that you are suicidal in the moment," correctional staff cannot put the person on suicide watch.[7] (Doc. 164-1 n. 13, citing Ex. D Celosse Depo. 16:10-22).

Defendant testified that Decedent's self-described history of suicide attempts and suicidal ideation was full of inconsistencies, and that these inconsistencies needed to be factored into evaluating Decedent's suicide risk. (Doc. 163-4 n. 14, citing Deposition of Dr. Narayan ("Narayan Depo.") at 47-49). Defendant further testified that questions about the veracity of Decedent's reporting meant the staff of CCI could not implicitly take everything Decedent said at face value.[8] *Id.*

Defendant attested that his first involvement with Decedent's treatment was on November 16, 2017, when Defendant was advised that Decedent arrived at CCI. (Doc. 163-4 n. 15; Doc. 164-1 n. 15). Defendant reviewed Decedent's medication at that time.[9] *Id.* Defendant had his first direct contact with Decedent on December 4, 2017. (Doc. 163-4 n. 16; Doc. 164-1 n. 16). Decedent informed Defendant that he continued to have "mental health problems" and did not think his then-current medication regiment was helping. *Id.* Decedent agreed to wait for his next mental health appointment and would address long-term issues at that time. *Id.*

Three days later, Defendant had his second direct contact with Decedent via telemedicine for Decedent's Initial Psychiatric Evaluation on December 6, 2017. (Doc. 163-4 n. 17; Doc. 164-1 n. 17). Defendant annotated in Decedent's medical records that he had a family history of suicidal behavior,

---

[7] Dr. Celosse's testimony does not establish as an undisputed fact that a person with a prior history of suicide attempts may be an acute risk of suicide *only* if they verbalize a present intention to commit suicide, as Defendant asserts. *See* (Doc. 163-4 n. 13).

[8] Plaintiffs dispute that Decedent's self-described history was not indicative of his suicidal ideation, attempts, and risk. (Doc. 164-1 n. 14).

[9] Plaintiffs dispute the implication that Defendant was not responsible for reviewing Decedent's file, medical records and medical history, which were provided when Decedent arrived at CCI in November 2017. (Doc. 164-1 n. 15, citing Ex. A Khan Report p. 14 ("According to the DSM-V reasonably psychiatrist [] must do a thorough assessment, which includes a review of the pertinent medical records, especially the inpatient records."), Ex. D Celosse Depo. 29:20-30:3).

4

including a grandmother who died by suicide at age 40.  (Doc. 164-1 n. 16, citing Ex. C Medical Records DEF 02260, 02262).  Defendant also annotated that Decedent was "confirmed" for "polysubstance dependence meth, MJ, EtOH, heroin, Ecstasy, sherm."  *Id.*  The same medical record documents that Decedent had a drug overdose on July 26, 2017 – just five months prior to the evaluation.  *Id.*

Defendant annotated in contemporaneous medical records and attests in his declaration in support of his motion for summary judgment that Decedent denied having a history of "genuine" suicide attempts, and no history of genuine psychosis, mania, or hypomania.  (Doc. 163-4 n. 17; Doc. 164-1 n. 17).  However, Defendant documented in the same records that Decedent reported he "tried to kill myself – twice – they put me in EOP" approximately two years earlier.  (*See* Doc. 164-1 Ex. C Medical Records DEF 02238).  Defendant also documented Decedent's report that he "was paranoid and suicidal."  *Id.*[10]  Although Defendant attests that Decedent claimed that he had "psychological distress" without further elaboration and stated his symptoms had improved since he was first incarcerated, he cites no specific records and the medical records in evidence documenting Defendant's encounter with Decedent on December 6, 2017, do not memorialize these observations.  (Doc. 163-4 n. 18; Doc. 164-1 n. 18 citing Ex. C Medical Records DEF 02259-02262).  Similarly, although Defendant attests in his summary judgment declaration that Decedent denied any self-harming or suicidal triggers and noted

---

[10] Plaintiffs dispute that the medical records reflect Decedent's denial of suicide attempts.  As set forth above, Defendant documented Decedent's self-report of prior suicide attempts and it appears Defendant may have discounted those attempts as not "genuine."

Defendant's separate assertion that it is undisputed Decedent denied any "history of genuine psychosis, mania, or hypomania" is not supported by the evidence cited – instead, the medical records document Defendant's assessment (not Decedent's statement) concerning lack of history of genuine mental health disorders referenced.  (*See* Doc. 164-1 Ex. C Medical Records DEF 02238).

Although Defendant attests in his summary judgment declaration that the records he reviewed evidence Decedent's history of hoarding medications and of exaggerating symptoms and that oddities in his thinking were not persistent or did affect his actions (Doc. 163-4 n. 17), he cites no specific records and Plaintiffs plausibly dispute this assertion by referencing records to the contrary.  (*See* Doc. 164-1 n. 17, citing Ex. C Medical Records DEF 02259-02262).  For instance, Plaintiffs note that a report dated January 18, 2017, which identifies it was "last updated 12/6/2017" by "[Defendant] Narayan, Pratap Chf," included the following comments: "adjustment disorder with mixed anxiety and depressed mood [] rule out;" "polysubstance dependence [] confirmed;" and a family history of suicidal behavior.  Likewise, those records reviewed showed: drug overdose on 7/26/2017; "antisocial personality disorder [] diagnosis date 3/30/2017;" "anxiety[, ] depression[, ] mood swings [] 6/13/2017."  More specifically, those records state "psychosis [] 3/30/2017 [and] 10/26/2017 [] [n]on-[s]pecified [] confirmed; "schizophrenia, paranoid [] 4/27/2017; [n]on-[s]pecified [] [c]onfirmed."  *Id.*

that Decedent had several coping strategies, a future-oriented thought process, and was looking forward to being a parent to his daughter, E.M, the contemporaneous medical records do not document these observations.  (Doc. 163-4 n. 19; Doc. 164-1 Ex. C Medical Records DEF 02238-02239; 02260; 02262).

Defendant's third direct contact with Decedent occurred on January 2, 2018.  (Doc. 163-4 n. 20; Doc. 164-1 n. 20).  Defendant noted that Decedent appeared stable and functional at that time.  *Id.* Defendant avers that Decedent claimed "psychosis" but did not present any indication of "genuine" psychosis, and that Decedent denied any suicidal thoughts or plans.[11]  *Id.*  According to Defendant, Decedent appeared logical and goal-oriented in his thinking.  *Id.*

Defendant's fourth and final direct contact with Decedent occurred on January 29, 2018.  (Doc. 163-4 n. 21; Doc. 164-1 n. 21).  Defendant avers that Decedent claimed he had difficulty concentrating but denied any suicidal thoughts or plans.[12]  *Id.*  Decedent appeared logical and goal-oriented in his thinking and stated that his goal was to go on SSI when he was released from custody.  *Id.*  In a "progress report" documenting an encounter with Decedent several days prior to Defendant's January 29 contact with Decedent, a social worker memorialized that Decedent recounted to him his history of suicide attempts but denied existing suicidal thoughts that date.  (Doc. 164-1 Ex. C. Medical Records DEF 02216).  It is unclear whether Defendant reviewed this record prior to his January 29 meeting with Decedent.

Defendant testified that he did not give Dr. Celosse any directives or instructions as to Decedent's care nor was he Dr. Celosse's supervisor.  (Doc. 163-4 ns. 22, 23; Doc. 164-1 ns. 22, 23). Defendant testified that the only time he brought something regarding Decedent to Dr. Celosse's attention was in an email he transmitted to her on December 6, 2017, in which he documented his encounter that day with Decedent, his assessments regarding Decedent's "likely impression-management" and "hoarding meds."  (Doc. 163-4 n. 24; Doc. 164-1 n. 24, citing Ex. C Medical Records DEF 05339).  Defendant also raised in his email to Dr. Celosse the prospect that Decedent "might be a

---

[11] Plaintiffs deny the implication that there was no "genuine psychosis," and there was no suicidal thoughts or plans.  (Doc. 164-1 n. 20).

[12] Plaintiffs deny the implication that Decedent had no suicidal thoughts or plans.  (Doc. 164-1 n. 21).

good candidate for referral for psych testing (if possible) to rule out malingering."[13]  *Id.*  Defendant told

Dr. Celosse, "[l]et me know your thoughts/concerns."  *Id.*  No psychological testing of Decedent was

done from the time he entered CCI in November 2017 through the date of his death.  (Doc. 163-4 n. 25;

Doc. 164-1 n. 25).

In California, psychological testing can be done only by psychologists; it is not in the domain of

psychiatrists.  (Doc. 163-4 n. 26; Doc. 164-1 n. 26).  Defendant testified that it was not his practice to

insist that his recommendations be followed, and that his role was that of a consultant to the primary

clinician.  (Doc. 163-4 n. 27; Doc. 164-1 n. 27).  Defendant further testified that the primary clinician

was the primary clinical "driver of the bus[,]" and that pursuing his recommendation (regarding referral

for psychological testing) would not have added substantially to his management of Decedent's medical

or medication needs.[14]  *Id.*

The California Medical Board investigated a complaint regarding Defendant's conduct with

regard to Decedent.  (Doc. 163-4 n. 28; Doc. 164-1 n. 28).  The Board determined that there was no

merit to the complaint and the case was closed in 2022.  *Id.*

**B.    Plaintiffs' Statement of Disputed Facts**

In addition to responding to Defendant's statement of undisputed facts, Plaintiffs advance their

own "Statement of Disputed Facts" upon which they rely in opposing Defendant's motion for summary

judgment.  *See* (Doc. 164 pp. 4-8); *see also* (Doc. 164-1 pp. 14-22).  Defendant did not respond to

Plaintiffs' disputed facts other than to argue that Dr. Khan's expert report/declaration (upon which the

majority of Plaintiffs' disputed facts are based) should be disregarded.  Accordingly, where Plaintiffs'

---

[13] Plaintiffs dispute the implication that Defendant met his responsibilities by emailing Dr. Celosse about psychological testing.  Plaintiffs show the only medical records identifying this were written on December 6, 2017, and Dr. Celosse left CCI that same month.  Plaintiffs argue that there is no evidence that Defendant re-ordered the psychological testing with Dr. Celosse's replacement.  (Doc. 164-1 n. 24, citing Ex. C Medical Records DEF 05339, Ex. D Celosse Depo. 22:15-16).

[14] Plaintiffs dispute the implication that Defendant had no responsibility for Decedent's medical care and the implication that Defendant had no responsibility to re-submit the recommendation for psychological testing to Dr. Celosse's replacement.  (Doc. 164-1 n. 27, citing Ex. A Khan Report p. 15, Ex. C Medical Records DEF 05339, Ex. D Celosse Depo. 22:15-16).

disputed facts have some evidentiary basis, the undersigned views them in the light most favorable to Plaintiffs. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

Plaintiffs assert that throughout Decedent's incarceration from November 9, 2017, until his death by suicide on February 2, 2018, Defendant, as Chief Psychiatrist, was Decedent's treating psychiatrist and the leader of Decedent's treatment team. (Doc. 164 pp. 4-5).

Plaintiffs detail Decedent's lengthy mental health history. *Id.* at 5. Prior to his incarceration at CCI, Decedent was diagnosed with psychotic disorder, adjustment disorder with mixed anxiety and depressed mood and placed on suicide watch in April 2016. *Id.* Decedent was specifically diagnosed with psychosis on March 30, 2017, and again on October 26, 2017—approximately two weeks before he arrived at CCI. *Id.* Upon Decedent's arrival at CCI on November 9, 2017, Decedent was on four psychiatric medicines. *Id.* At the time of his death, Defendant had reduced those medicines to only two. *Id.* Decedent's further mental health history included diagnoses of adjustment disorder with depressed mood, antisocial personality disorder, anxiety, psychosis, schizophrenia paranoid type, PTSD, and substance abuse of methamphetamine, heroin, ecstasy, phencyclidine, alcohol, and marijuana. *Id.* Between April 2016 and December 4, 2017, Decedent had been placed in a mental health crisis bed seven times. *Id.* (citing Doc. 164-1, Ex. C Medical Records DEF 02236).

Decedent had a history of carrying a loaded gun when depressed and potentially suicidal. *Id.* at 5-6. He also had a maternal grandmother who had committed suicide at 40 years of age, and a brother who had attempted suicide in jail. *Id.* Decedent had a history of suicide attempts that he did not contemporaneously report, including by overdosing. *Id.* at 6. Decedent had a history of hoarding pills, including on July 24, 2017, and October 13, 2017. *Id.* Decedent had been on suicide watch multiple times prior to his incarceration at CCI. *Id.* In one non-contemporaneous report of his suicidality in July 2017, Decedent told the provider: "I'm telling you I'm going to do it again [] just wait till my cellie goes to yard and I'll hang myself this time." *Id.* Decedent committed suicide, by hanging, after his cellmate left their shared cell on February 2, 2018. *Id.* Decedent spoke with some frequency of his suicidality, his troubling history and psychosis after he entered CCI. *Id.*

Plaintiffs detail Defendant's involvement with Decedent's medication. *Id.* Four days after Decedent arrived at CCI, Defendant discontinued Decedent's antidepressant without seeing Decedent

1   or discussing the ramifications with him. *Id.* at 6. (citing Doc. 164-1, Ex. C Medical Records DEF

2   02202). According to Dr. Khan, Defendant also attempted to lessen an anti-psychotic medication for

3   Decedent, which prompted an email from a team member asking Defendant to stop such titration. *Id.*

4   at 6 (citing Doc. 164-1, Ex. A. Khan Report at 6).[15] On January 29, 2018 (four days prior to his death

5   by suicide), Defendant restarted Decedent's administration of the antidepressant Remeron. *Id.*

6   Plaintiffs detail Defendant's interactions with Decedent. *Id.* at 7. At their first interaction on

7   November 30, 2017, Decedent told Defendant "[his] psyche is all over the place." *Id.* On December 6,

8   2017, Defendant documented Decedent's claim that he had been "paranoid and suicidal." *Id.* Plaintiffs

9   note that in the weeks preceding Decedent's death, "Decedent was becoming increasing[ly] agitated and

10  had thought insertions." *Id.* On January 29, 2018 – four days prior to his suicide – Decedent told

11  Defendant he has schizophrenia, needed anti-psychotic medicine, and had "psychosis [], see[s] shadows

12  [] [and] am paranoid." *Id.* (citing Doc. 164-1, Ex. C Medical Records DEF 02198). Defendant, in

13  response, focused solely on impression management and assessed Decedent's comments were "not

14  suggestive of genuine psychosis or biopolarity." *Id.*

15  Plaintiffs separately assert that, during this same mental health encounter with Defendant four

16  days prior to Decedent's death by suicide (*e.g.*, January 29, 2018), Decedent told Defendant that "[he]

17  tried to kill [himself]-twice-they put [him] in EOP" (enhanced outpatient program), and that he had been

18  in a mental health crisis bed more than 30 times. *Id.* (citing Doc. 164-1, Ex. C Medical Records DEF

19  02198). But this assertion of fact is not accurate. Instead, the Decedent's comment to Defendant in this

20  regard is listed within a section of the referenced medical record titled "subjective/history of present

21  illness." *Id.* Decedent's verbatim statement to Defendant is memorialized in earlier medical records,

22  including during Defendant's second contact with Decedent on December 6, 2017. (*See* Doc. 164-1,

23  Ex. C Medical Records DEF 02238). Neither are Plaintiffs correct in asserting that on January 29, 2018,

24  Defendant diagnosed Decedent with adjustment disorder, polysubstance dependence, and antisocial

25

26

---

27  [15] Although Dr. Khan annotates in her report the 'DEF' Bates-page number for numerous of the purported facts upon which she relies, she does not cite any document in support of her assertion that

28  Defendant attempted to lessen an anti-psychotic medication for Decedent, which prompted an email from a team member asking Defendant to stop such titration.

personality disorder – those references also appear in the "history of present illness" section of the cited medical record and are expressly characterized as historical diagnoses.  *Id.*

At the conclusion of Defendant's final encounter with Decedent on January 29, 2018, Defendant ordered that he would not see Decedent again for 11 to 12 weeks.  *Id.*

Decedent had suffered a catastrophic weight loss from 196.2 pounds when he entered CCI on November 9, 2017, to 139 pounds on the date of his suicide on February 2, 2018.  *Id.* at 7-8.  At the time of his death, Decedent was at the lowest level of outpatient mental health care.  *Id.* at 8.

## APPLICABLE LAW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

Each party's position must be supported by: (1) citing to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  *See* Fed. R. Civ. P. 56(c)(1).  A court may consider other materials in the record not cited to by the parties, but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (on summary judgment, "the court has discretion in appropriate circumstances to consider other materials, [but] it need not do so").  Furthermore, "[a]t summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial."  *Nevada Dep't of Corr. v. Greene*, 648 F.3d 1014, 1019 (9th Cir. 2011) (citations and internal quotations omitted).  The focus is on the admissibility of the evidence's contents rather than its form.  *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 846 (9th Cir. 2004).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett,*

477 U.S. at 317, 323 (1986)).  To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets this initial burden, the burden then shifts to the non-moving party "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323).  The non-moving party must "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson,* 477 U.S. at 252).  However, the non-moving party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.,* 809 F.2d at 630.

The court must apply standards consistent with Rule 56 to determine whether the moving party has demonstrated the absence of any genuine issue of material fact and that judgment is appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley,* 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## DISCUSSION

### A.    Plaintiffs' Motion to Exclude Defendant's Expert Witness

Plaintiffs seek to exclude Defendant's expert witness, Dr. Marvin Firestone, as a sanction pursuant to Rule 37 on the grounds that Defendant's expert disclosure and the expert's report are deficient under Rule 26(a).  (Doc. 161).  Specifically, Plaintiffs argue that Dr. Firestone's initial and supplemented expert reports are vague, fail to disclose the facts or data he considered, and fail to adequately disclose the basis for his expert opinions. *See* (Doc. 161-1 at 7-10).  Plaintiffs separately move the Court to exclude Dr. Firestone from testifying pursuant to Rule 702 on the grounds that he is

1  unqualified to offer the proffered opinions and such opinions are unreliable and not based on acceptable

2  methodology.  (Doc. 162).

3          **1.      Legal Standard**

4          Federal Rule of Civil Procedure 26 provides in relevant part that "[i]n addition to the [initial]

5  disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any

6  [expert] witness it may use at trial." Fed. R. Civ. P. 26(a)(2)(A); *see Gorrell v. Sneath*, No. 1:12-cv-

7  0554-JLT, 2013 WL 4517902, at *1 (E.D. Cal. Aug. 26, 2013).  Parties are required to make these expert

8  disclosures "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).

9  Separately, pursuant to Rule 26(e)(1)(A), "a party who has made a disclosure under Rule 26(a) - or who

10  has responded to an interrogatory, request for production, or request for admission - must supplement

11  or correct its disclosure or response in a timely manner if the party learns that in some material respect

12  the disclosure or response is incomplete or incorrect...."  Fed. R. Civ. P. 26(e)(1)(A).

13          Under Rule 37(c), a party that "fails to provide information or identify a witness as required by

14  Rule 26(a) or (e)" may not "use that information or witness to supply evidence ... at a trial, unless the

15  failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  *See Yeti by Molly, Ltd. v.*

16  *Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these

17  requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a)

18  that is not properly disclosed.").   "The Advisory Committee Notes describe it as a 'self-executing,'

19  'automatic' sanction to 'provide[ ] a strong inducement for disclosure of material....' "  *Id*. (quoting Fed.

20  R. Civ. P. 37 advisory committee's note (1993)).  "Among the factors that may properly guide a district

21  court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice

22  or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the

23  prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not

24  timely disclosing the evidence."  *Lanard Toys Ltd. v. Novelty, Inc*., 375 Fed. Appx. 705, 713 (9th Cir.

25  2010) (citing *David v. Caterpillar, Inc*., 324 F.3d 851, 857 (7th Cir. 2003)).  "The party facing sanctions

26  bears the burden of proving that its failure to disclose the required information was substantially justified

27  or harmless."  *R & R Sails, Inc. v. Ins. Co. of Pa*., 673 F.3d 1240, 1246 (9th Cir. 2012).

28

Relevant here, the sanction of evidence exclusion is not mandatory under Rule 37(c)(1).  *See Bonzani v. Shinseki*, No. 2:11-CV-0007-EFB, 2014 WL 66529, at *3 (E.D. Cal. Jan. 8, 2014) (finding Rule 37(c)(1) exclusion sanctions are not mandatory, even when the insufficient disclosures are not substantially justified or harmless). A court's decision to exclude evidence is discretionary and the court is given "particularly wide latitude ... to issue sanctions under Rule 37(c)(1)."  *Id.*

### 2.    Analysis

Plaintiffs originally filed a motion materially similar to their pending motions to exclude Dr. Firestone on July 31, 2024.  (Doc. 159).  The day following the filing of Plaintiffs' earlier motion, the Court denied the motion for Plaintiffs' failure to comply with the previously assigned magistrate judge's informal discovery dispute procedures, which the undersigned adopted upon reassignment of the case.  *See* (Doc. 160) (citing Docs. 98 and 151).  Those procedures require a party – following unsuccessful meet/confer efforts to resolve any discovery dispute and before filing a discovery motion – to "promptly seek a telephonic hearing with all involved parties and the Magistrate Judge.  It shall be the obligation of the moving party to arrange and originate the conference call to the court."  *Id*. (citing Doc. 98, "Scheduling Order," at 3-4).

Plaintiffs did not seek an informal discovery dispute conference with the undersigned following the denial of their earlier motion to exclude.  Instead, approximately six weeks after their earlier motion was denied, and only once discovery had closed, Plaintiffs re-filed a motion once again seeking to exclude Dr. Firestone.  (Doc. 161).  At the motion hearing, when questioned why Plaintiffs failed to pursue the mandatory informal discovery dispute procedures that the Court referenced in denying the earlier motion, counsel for Plaintiffs appeared unaware of the procedures and could not offer an explanation as to why the procedures were not followed.

Mandatory informal discovery dispute resolution procedures are implemented, in part, to afford courts some modicum of relief from their overtaxed dockets by streamlining the resolution of discovery disputes and obviating the need for cumbersome motion practice where possible.  Such procedures cannot facilitate the accomplishment of this goal unless they are followed and enforced.  *See, e.g., Standard Ins. Co. v. Riley*, No. CV619-084, 2022 WL 22891042, at *1 (S.D. Ga. Mar. 15, 2022)

1  (denying discovery motion for party's failure to first pursue mandatory informal discovery dispute

2  resolution procedures).

3   Accordingly, because Plaintiffs violated the Scheduling Order and the requirement to seek an

4  informal discovery dispute conference and permission from the Court prior to filing any discovery

5  motion, the Court will exercise its broad discretion to decline to exclude Defendant's expert, Dr.

6  Firestone.

7  **B. Defendant's Motion to Disqualify Plaintiffs' Expert Witness**

8   Defendant seeks an order from the Court disqualifying Plaintiffs' expert witness, Dr. Salma K.

9  Khan, from involvement in the case due to a purported conflict of interest asserted by Dr. Khan's

10  employer, the CDCR.  Defendant argues disqualification (including the striking of her expert report

11  submitted in opposition to Defendant's motion for summary judgment) is warranted "because her

12  employer CDCR instructed her to withdraw her declaration [filed by Plaintiffs in opposition to

13  Defendant's motion for summary judgment] and withdraw from the case" and Dr. Khan has failed to

14  comply with CDCR's purported instruction.  (Doc. 175-1 at 2).  Although Defendant cites Rule 702 in

15  his notice of motion as authority for disqualifying Dr. Khan, he cites no authority in the supporting

16  memorandum of law applying Rule 702 in such a manner; instead, the authorities cited by Defendant

17  address a court's inherent powers as a basis for excluding an expert witness.

18   In support of the motion, Defendant attaches the declaration of Janelle Jenks, a CDCR human

19  resources employee, and various emails between CDCR employees and Dr. Khan relating to CDCR's

20  demand that Dr. Khan withdraw her expert declaration and withdraw and recuse herself from further

21  involvement in this case at the risk of discipline.[16]  Defendant argues "fundamental fairness requires

22  disqualification" and that disqualifying Dr. Khan would promote public confidence in the legal system.

23  (Doc. 175-1 at 4-5).

24   In opposition, Plaintiffs argue disqualification is unwarranted given Defendant's failure to

25  demonstrate that he and Dr. Khan ever entered into a confidential relationship or that Dr. Khan disclosed

26

27    [16] Defendant also purports to include with his motion a joint statement he previously filed addressing the issues raised in his motion.  *See* (Doc. 175-2 at ¶ 2, Exhibit A) (citing Doc. 161).  However, that

28  filing does not relate to Defendant's attempt to disqualify Plaintiffs' expert; instead, the filing relates to Plaintiffs' attempt to exclude Defendant's expert.

any confidences in connection with her expert services.  (Doc. 176 at 10-11).  They further argue that disqualification would subject them to "extreme prejudice" and would disrupt the proceedings.  *Id*. at 13.

### 1.    Legal Standard

"Courts are invested with inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'"  *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*., 982 F.2d 363, 368 (9th Cir. 1992) (quoting *Chambers v. NASCO, Inc*., 501 U.S. 32, 43 (1991)).   The Court of Appeals has upheld the exclusion of expert testimony under a district court's inherent powers in several different contexts where the exclusion is "carefully fashioned," including to sanction a party's violation of discovery rules or rules of professional responsibility or to remedy the party's spoliation of evidence.  *See Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1557-59 (9th Cir. 1996) (citing cases; reversing district court for abusing discretion in excluding expert from testifying).

### 2.    Analysis

In support of his motion, Defendant cites district court cases for the proposition that disqualification of an expert witness is appropriate where such relief is necessary to prevent the expert from violating the privilege of confidentiality with her employer and, more generally, to preserve public confidence in the fairness and integrity of judicial proceedings.

For instance, in *Hewlett-Packard Co. v. EMC Corp*., 330 F. Supp.2d 1087 (N.D. Cal. 2004). (Doc. 175-1 at 3; Doc. 177 at 2),[17] the district court declined to disqualify plaintiff's expert witness whom the defendant argued had breached promises to protect defendant's confidential information.  The court noted that "disqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely."  *Id*. at 1092 (citing *inter alia Koch Ref. Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996).  The court further noted that, absent a showing that the moving party disclosed confidential information to the expert that is relevant to the current litigation, "disqualification likely is inappropriate."  *Id*. at 1093 (citation omitted).

---

[17] Defendant incorrectly cites this case as 330 F. Supp.2d 1086 (N.D. Cal. 2014).

1      Here, however, Defendant does not argue – let alone demonstrate – that Dr. Khan has procured

2  confidential information from her nonparty employer (CDCR) that she either has improperly disclosed

3  in her expert declaration or threatens to disclose in connection with her anticipated testimony.

4      The single binding authority cited by Defendant in support of his motion – *Campbell Indus. v.*

5  *M/V Gemini*, 619 F.2d 24 (9th Cir. 1980) – is not applicable here. *See* (Doc. 175-1 at 3; Doc. 177 at 2-

6  3). In that case, the Court of Appeals affirmed the district court's exclusion of defendant's expert

7  witness because plaintiff earlier noticed that same witness as its expert and defendant undertook ex parte

8  communications with the expert after plaintiff had identified him, in violation of Rule 26(b)(4).

9  *Campbell Indus.*, 619 F.2d. at 27. There is no similar allegation or argument here that either side

10  improperly communicated with its adversary's expert following the expert's designation, and Defendant

11  does not attempt to argue that Plaintiffs have violated any discovery rule in noticing Dr. Khan as their

12  expert witness.

13      While protecting evidentiary privileges and promoting public confidence in the fidelity of court

14  proceedings are important equities, the undersigned finds that Defendant fails to advance any

15  compelling basis – whether based on these equities or otherwise – for the Court to strike Dr. Khan's

16  expert declaration or preclude her from testifying at trial. *Cf. Skidmore v. Led Zeppelin*, 952 F.3d 1051,

17  1078 (9th Cir. 2020) (finding the district court did not abuse its "broad discretion" by permitting expert

18  to testify notwithstanding his alleged conflict of interest).[18]

19  **C.    Eighth Amendment Deliberate Indifference Claim Against Defendant**

20      **1.    Legal Standard**

21      "[T]he Eighth Amendment's prohibition against cruel and unusual punishment, made applicable

22  to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide

23  adequate medical care to incarcerated prisoners." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,

24  489 U.S. 189, 198-99 (1989). To establish an Eighth Amendment claim on a condition of confinement,

25  such as medical care, a Plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2)

26

27  ———————————

[18] Because the Court will deny Defendant's motion to disqualify Dr. Khan, the Court will deny as
moot Plaintiffs' motion to strike Defendant's reply in support of his motion for summary judgment

28  (Doc. 166), which ostensibly seeks the same or similar relief (*i.e.*, to foreclose Defendant from arguing
in favor of disqualifying Dr. Khan).

the official was, subjectively, deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim. *Willhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002).

To satisfy the objective prong, there must be a "serious" medical need. *Estelle v. Gamble*, 429 U.S. 87, 104 (1976). A medical need is serious if failure to treat it will result in "significant injury or the wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)). "[T]he conditions presenting the risk must be 'sure or very likely to cause ... needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

As to the subjective prong, there must be deliberate indifference. Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer*, 511 U.S. at 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)); *see Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("Deliberate indifference is a high legal standard"). Although the state of mind for deliberate indifference commonly is characterized as "subjective recklessness," that standard is "less stringent in cases involving a prisoner's medical needs ... because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) (internal quotations and citations omitted). Thus, deliberate indifference is shown when a prison official knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 847; *see Gibson v. Cnty. of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002).

The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Farmer*, 511 U.S. at 837. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted).

This "subjective approach" focuses only "on what a defendant's mental attitude actually was." *Farmer*, 511 U.S. at 839.  *See Disability Rights Montana, Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019) ("The second prong is met upon showing of deliberate indifference, which, as *Farmer* makes clear, is shown adequately when a prison official is aware of the facts from which an inference could be drawn about the outstanding risk, and the facts permit us to infer that the prison official in fact drew that inference, but then consciously avoided taking appropriate action.").  Whether a defendant possessed subjective knowledge is a factual question that is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

The Ninth Circuit holds that "[a] heightened suicide risk or an attempted suicide is a serious medical need." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 89 (9th Cir. 2011).  Accord *Simmons v. Navajo Cnty., Arizona*, 609 F.3d 1011, 1018 (9th Cir. 2010) (citing *Conn*, 591 F.3d at 1095), *overruled on other grounds by Castro v. Cnty. of LA.*, 833 F.3d 1060 (9th Cir. 2016) (en banc).  Where the alleged deliberate indifference involves an inmate's death by suicide, the Ninth Circuit has articulated the subjective test as follows: "To proceed to trial, [plaintiffs] must adduce evidence raising a triable issue that [defendant knew decedent] was 'in substantial danger' of killing himself yet deliberately ignored such risk." *See id.* at 1019 (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1248 (9th Cir.2010)).  *See also id.* ("We cannot agree, however, that the evidence supports the inference that [defendant knew decedent] '*was at acute risk of harm*' at the time he killed himself") (quoting *Conn*, 591 F.3d at 1097) (emphasis added).

A mere difference of opinion as to what medically acceptable course of treatment should be followed does not establish deliberate indifference. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to the proper course of care where prison medical staff treated his recurring abscesses with medicine and hot packs).  "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058.

2.      **Analysis**

Defendant does not challenge that Plaintiffs satisfy the objective prong of the deliberate indifference inquiry – that Decedent had serious medical needs relating to his mental health conditions while incarcerated.  *Estelle*, 429 U.S. at 104 ("To satisfy the objective prong, there must be a 'serious' medical need."); (Doc. 163); (Doc. 164 p. 4) ("In his motion, Defendant does not argue that Decedent's suicidality was not a serious medical need.").  Indeed, the Ninth Circuit has expressly recognized that a heightened risk of suicide can present a serious medical need.  *See, e.g., Simmons*, 609 F.3d at 1018 (*supra*).  The issue presented by Defendant's motion for summary judgment is whether Defendant was subjectively aware that Decedent faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it.  (Doc. 163 p. 5) ("In order to succeed on their claim, Plaintiffs must make a subjective showing that the alleged deprivation of adequate medical care occurred with deliberate indifference to the [Decedent]'s health or safety."); (Doc. 164 p. 4) ("[T]he motion focuses entirely on whether or not Defendant acted with deliberate indifference.").

In arguing that no genuine issues of material fact exist regarding whether Defendant acted with deliberate indifference (Doc. 163 at 3-6), Defendant inaptly and repeatedly refers the Court to allegations in the complaint instead of citing record evidence for the proposition that no issues of fact remain.  *E.g.*, *id.* at 4 ("Even construing the allegations in the Complaint in the light most favorable to Plaintiffs, the specific allegations against Defendant Dr. Narayan do not show this level of deliberate indifference.") *and* ("Plaintiff's Complaint notes that …"); *id.* at 5 ("Plaintiff's Complaint is based on a hindsight evaluation of Dr. Narayan's actions, …").  Indeed, although Defendant filed a statement of undisputed facts in support of his motion for summary judgment, his six-page legal memorandum does not contain a single citation to record evidence.[19]

---

[19] Although the Court will deny Plaintiffs' motions to exclude Defendant's expert witness (Dr. Firestone), who opines that Defendant acted within the standard of care and that his care was unrelated to Decedent's death, Plaintiff inexplicably fails to rely on or even cite Dr. Firestone's opinions in his summary judgment papers.  *See* (Docs. 163-1 & 163-4); *see also* (Doc 161-2).  Accordingly, the undersigned does not consider Dr. Firestone's opinions in recommending denial of Defendant's motion.  *See Carmen*, 237 F.3d at 1031 (on summary judgment, court is within its discretion to disregard record materials not cited or relied upon by the moving party).

1    In support of his argument that Defendant was not subjectively aware of or drew an inference

2    that Decedent was at an acute risk of harm, Defendant characterizes his involvement with Decedent's

3    care and treatment as "minimal," noting that he saw Decedent only four times via telemedicine.  (Doc.

4    163 pp. 3-6).  Defendant also asserts that those who were directly involved in Decedent's care were not

5    under his supervision.  *Id.* at 6.  Defendant notes that though he was able to make recommendations

6    regarding psychological testing, and while he did in fact make such recommendations, he had "no

7    authority to require that such testing be done."  *Id.*  Defendant points out that Plaintiffs do not allege

8    that Defendant violated any of the protocols relating to mental health treatment in California correctional

9    facilities, nor do Plaintiffs allege that Defendant had any authority to go beyond what those protocols

10   require in this case.  *Id.*  Defendant argues that "[a]ll that is left is difference of opinion[,]" which "does

11   not establish [] deliberate indifference."  *Id.*  Thus, Defendant contends there is no genuine issue of fact

12   regarding his liability for Decedent's suicide.  *Id.*

13   In his reply, Defendant fixates on Decedent's history of hoarding medication he prescribed and

14   seeks to direct blame to others: "[t]he staff at the Kern Valley State Prison in direct contact with the

15   [D]ecedent failed to take appropriate action," and, "[t]he responsibility to see that Decedent ingested the

16   medication lies with the prison staff in direct contact with [Decedent]."  (Doc. 165 at 3-4).

17   Relying largely on the expert report and declaration of Dr. Khan, Plaintiffs argue that the record

18   is replete with disputed issues of material fact concerning Defendant's deliberate indifference sufficient

19   to defeat summary judgment.  In her report, Dr. Khan faults Defendant as being deliberately indifferent

20   in choosing to ignore the diagnoses of others (*i.e.,* the authors of medical reports who diagnosed

21   Decedent's mental health conditions) and Decedent's long history of mental health issues, suicidal

22   ideations and repeated placement in crisis beds in deference to Defendant's unsupported belief that

23   Decedent's only problem was "impression management."[20]   Dr. Khan further disputes Defendant's

24

25   [20] Although Dr. Khan would not be permitted at trial to testify that Defendant was deliberately
     indifferent, she could testify as to how a hypothetical doctor operating under circumstances similar to
26   those relevant here reasonably would have cared for Decedent consistent with applicable medical
     standards.  *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1058 (9th Cir. 2008)
27   (holding an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an
     ultimate issue of law); *Zeen v. County of Sonoma*, No. 17-cv-02056-LB, 2018 WL 3769867, *3 (N.D.
28   Cal. Aug. 9, 2018) (permitting police practices expert to testify as to "what a hypothetical reasonable
     officer might have done" under defined circumstances); *Cotton v. City of Eureka, Cal*., No. C 08–

20

1   contention that he was a mere consultant, noting such characterization of his role is inconsistent with

2   the fact that Defendant prescribed (and de-prescribed) medications, requested and reviewed Decedent's

3   treatment records, and undertook over a short period of time four treatment encounters with Decedent.

4          The undersigned finds there are disputed issues of material fact as to Defendant's awareness of

5   Decedent's serious medical needs warranting denial of Defendant's motion for summary judgment.

6   Taken in the light most favorable to Plaintiffs, a trier of fact could conclude that Defendant was "aware

7   of the facts from which an inference could be drawn about the outstanding risk" of suicide to Defendant.

8   *See Disability Rights Montana, Inc.*, 930 F.3d at 1101.  In addition to the evidence noted above on which

9   Dr. Khan rests her opinion – including medical records documenting Decedent's mental health history

10  and Defendant's documented acknowledgement of Decedent's claimed mental health issues –

11  Defendant's awareness of the risk to Decedent is starkly illustrated in his email to Dr. Celosse after his

12  second encounter with Decedent, in which he suggested that Decedent "might be a good candidate for

13  referral for psych testing (if possible) to rule out malingering," and implored Dr. Celosse, "[l]et me know

14  your thoughts/concerns."  (Doc. 164-1 n, Ex. C Medical Records DEF 05339).  Intentional ignorance of

15  an obvious risk is not a defense to deliberate indifference.  *Farmer*, 511 U.S. at 842; *see Coleman v.*

16  *Wilson*, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (defendants cannot escape liability by turning a blind

17  eye to facts or inferences strongly suspected to be true).

18         In all events, when the risk is not obvious, the requisite knowledge may still be inferred by

19  evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences

20  that he strongly suspected to be true.  *Farmer*, 511 U.S. at 842.  Taken in the light most favorable to

21  Plaintiffs, a jury reasonably could conclude that the facts demonstrate Defendant, at the least, refused to

22  verify his suspicions and declined to confirm his strongly-held belief that Decedent did not have

23  "genuine" mental health issues.   Notwithstanding his suggestion to Decedent's then-attending

24  psychologist (Dr. Celosse) that Decedent be subjected to psychological testing, Dr. Celosse departed

25  CCI shortly after the recommendation and it is unclear from the record whether *any* psychologist

26

27  ────────────────

28  04386 SBA, 2010 WL 5154945, at *19 (N.D. Cal. Dec. 14, 2010) (plaintiffs' expert on police
    procedures permitted to offer opinion as to whether officers' use of force was consistent with agency
    policy and legal requirements).

1   replaced her.  What is clear is that Defendant undertook no efforts to see that his recommendation for

2   psychological testing was pursued.

3       The undersigned further finds there are disputed issues of material fact that Defendant inferred

4   Plaintiff was at acute risk of harm and "consciously avoided taking appropriate action."  *Disability*

5   *Rights Montana, Inc.*, 930 F.3d at 1101.  Among other deficiencies in the care he administered to

6   Decedent, Dr. Khan notes Defendant improperly: (1) failed to consider differential diagnoses; (2) failed

7   to order more mental health care, proper medications, and suicide risk assessments; (3) failed to move

8   Decedent to a level of care more appropriate to his diagnoses; (4) discontinued Decedent's

9   antidepressant without seeing him or discussing it with him; (5) failed to notice or act on Decedent's

10  catastrophic weight loss; (6) failed to ensure a continuity of care with a single clinician; (7) failed to

11  follow-up his recommendation for psychological evaluation after Dr. Celosse left CCI in December

12  2017; and (8) failed to obtain a second opinion from another psychiatrist regarding his discounting

13  Decedent's mental health concerns as not "genuine."  (Doc. 164 pp. 8-9).  Importantly, Dr. Khan

14  specifically finds that Defendant's discontinuance of Decedent's medications for psychosis, mood and

15  depression, without a definitive diagnosis, was beyond gross negligence and demonstrates deliberate

16  indifference.  *Id.* at 6-7.  Dr. Khan likewise opines that Defendant's order not to see Decedent for 11 to

17  12 weeks following his last contact with Decedent was medically unacceptable and demonstrates

18  deliberate indifference.  *Id.* at 7.

19      Defendant's suggestion that he was not authorized to undertake any higher level of care given

20  his position and, thus, could not have been deliberately indifferent towards Decedent, is clouded by

21  disputed issues of material fact.  Thus, for instance, while Defendant characterizes himself as a mere

22  "consultant" and not a supervisor of other medical professionals at CCI delivering care, Dr. Khan attests

23  that, in fact, as chief of psychiatry at CCI, Defendant was the leader of Decedent's treatment team.

24  Similarly, while Defendant characterizes his involvement in Decedent's care as marginal and secondary

25  to the direct care of onsite providers such as Dr. Celosse, Defendant retained the ability to control

26  Decedent's prescription regimen and actively evaluated Decedent and regularly assessed his mental

27  health in a manner reflecting that this involvement was greater than suggested.

28

Separately, the undersigned finds unpersuasive Defendant's argument that, even considering any purported disputed facts as summarized above, "[a]ll that is left is [a] difference of opinion" between Defendant and Decedent or between Defendant and other medical professionals that does not rise to level of deliberate indifference.  (Doc. 163 at 5-6).  It is true that the Court of Appeals has held that differences of medical opinion do not arise to deliberate indifference *where the challenged treatment was medically acceptable* – for instance, where the dispute involves a decision to undertake (or forgo) surgery instead of treating a medical issue in an alternative manner, or a decision to treat a medical condition with one medication instead of another acceptable medication.  *See Sanchez*, 891 F.2d at 242; *Toguchi*, 391 F.3d at 1058.  In contrast here, as summarized above, Defendant fails to rebut Plaintiffs' showing that disputed issues of material fact remain that show his "chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [Decedent's] health." *Toguchi*, 391 F.3d at 1058.  *See Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) ("The defendants argue that this was merely a difference of opinion that cannot amount to deliberate indifference. We disagree. Based on the unchallenged medical records and inferences drawn in favor of Snow, a reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances.").

While a jury could find that Defendant reasonably did not appreciate the extent of the medical risk Decedent faced or that Defendant took objectively reasonable measures to abate the risk he did perceive, on this record, the facts taken in the light most favorable to Plaintiffs reveal a jury could conclude Defendant's conduct constitutes deliberate indifference.

## FINDINGS AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY ORDERED:

1.  Plaintiffs' motions to exclude Defendant's expert witness (Docs. 161, 162) are **DENIED**;

2.  Defendant's motion to disqualify Plaintiff's expert witness (Doc. 175) is **DENIED**; and

3.  Plaintiffs' motion to strike Defendant's reply brief (Doc. 166) is **DENIED**.

///

///

23

And IT IS HEREBY RECOMMENDED:

    1.  Defendant's motion for summary judgment (Doc. 163) be **DENIED**.

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  **Within 14 days** after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown. The Court will not consider exhibits attached to the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   **November 22, 2024**

UNITED STATES MAGISTRATE JUDGE